**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 1:26-cr-0002** |
| | ) | **Hon. Leonie M. Brinkema** |
| **AMER TASIR ZGHAILAT QARALLEH,** | ) | **Trial:  May 4, 2026** |
| | ) | |
| **Defendant.** | ) | |

**RESPONSE TO GOVERNMENT'S MOTION IN LIMINE TO LIMIT
DEFENSE EXPERT TESTIMONY**

Amer Zghailat Qaralleh, by undersigned counsel, respectfully responds to the

government's Motion *in Limine* to Limit Defense Expert Testimony (Dkt. No. 61). The

government's motion should be denied for the reasons set forth below.

## I.   Legal standard.

Rule 702 was intended to liberalize the introduction of relevant expert

evidence. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1158–59 (4th Cir.1996).

Consequently, "[t]he court need not determine that the expert testimony a litigant

seeks to offer into evidence is irrefutable or certainly correct." *Westberry v. Gislaved*

*Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Indeed, "[t]he trial court's role as a

gatekeeper is not intended to serve as a replacement for the adversary system, and

consequently, the rejection of expert testimony is the exception rather than the rule."

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II)*

*MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018).

In sum, "an intelligent evaluation of facts is often difficult or impossible

without application of . . . specialized knowledge. The most common source of this

knowledge is the expert witness . . . ." *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1143 (4th Cir. 1980) (quoting Fed. R. Evid. 702, 1972 advisory committee notes). As with all other admissible evidence, expert testimony is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

## II.   Rick Vasquez

The government's attempts to limit defense expert Richard Vasquez's firearms testimony largely overlap with issues already briefed with respect to defendant's *Daubert* challenge to the government's firearms expert. *See* Dkt. No. 53 (*Daubert* Motion); Dkt. No. 64 (Reply). Accordingly, the defense incorporates those arguments here. Certain parts of the government's motion, however, require a brief additional response.

*First*, the government notes that this case is about the National Firearms Act ("NFA," 26 U.S.C. § 5801, *et seq.*) rather than the Gun Control Act ("GCA," 18 U.S.C. § 921, *et seq.*), and therefore that "any testimony about the GCA is irrelevant and must be excluded." Dkt. No. 61 at 5-6. This appears to be a reference to the fact that in Mr. Vasquez's expert notice, one of the definitions listed is from 18 U.S.C. § 921. *See* Dkt. No. 53-2 (Vasquez Disclosure) at 3. His relevant conclusions, however, are stated only under the NFA definitions. *See id.* at 3-4. To the extent he *also* noted that the item at issue failed the GCA definitions (*see, e.g., id.* at 2), he merely did so

because he was noticed as a rebuttal expert and the government's own firearms expert had proffered several conclusions under the irrelevant GCA definitions:

**Conclusions**:

**Exhibit 1**, is a weapon which will expel a projectile by the action of an explosive and incorporates the receiver of such a weapon; therefore, Exhibit 1 is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(A) & (B).

Exhibit 1, is a shotgun having a barrel of less than 18 inches in length and therefore is a "**short-barreled shotgun**" as defined in 18 U.S.C. § 921(a)(6).

*See* Dkt. No. 53-1 (Bautista Report) at 5. The government has now effectively withdrawn those portions of its own expert notice (*see* Dkt. No. 61 at n.1), so there is no need for Mr. Vasquez to offer rebuttal testimony. Accordingly, this portion of the government's Motion in Limine should be denied as moot.

*Second*, the government argues that Mr. Vasquez's conclusions are unreliable because they are based on his conclusion that Exhibit 1 could not fire a fixed shotgun shell from the shoulder, which is allegedly contradicted by Officer Bautista's testing. *See* Dkt. No. 61 at 6. For reasons argued in defendant's *Daubert* Reply, Officer Bautista's testing does not contradict Mr. Vasquez's conclusions because the testing demonstrates only that Exhibit 1 can do one of the two things (fire a slug) that a shotgun must, by definition, be designed to do when firing a fixed shotgun shell. *See* Dkt. No. 64 at 3-12. Moreover, the single function that Exhibit 1 *can* perform, per Officer Bautista's testing, is by far the less important of the two because the ability to fire ball shot is the defining characteristic of a shotgun, and Officer Bautista's conclusions read that requirement out of the conjunctive definition. *Id.* at 9-11. Accordingly, Mr. Vasquez's proffered expert testimony—that Exhibit 1 is not "made or remade to use the energy of the explosive in a fixed shotgun shell to fire . . . either

-3-

a number of projectiles (ball shot) or a single projectile," *see* 26 U.S.C. § 5845(d)—is based on a reliable application of the law to the facts. For the same reason, Officer Bautista's proposed testimony is based on a fundamental misreading of the statutory definition.

*Third*, the government moves to exclude that portion of Mr. Vasquez's testimony discussing the fact—apparently agreed to by both experts—that Exhibit 1 appears incapable of firing ball shot without injuring the operator. This should be denied for two reasons. First, the government's reliance on the legislative purpose of the NFA, which was to regulate "highly dangerous weapons," *see* Dkt. No. 61 at 7 (citation omitted), ignores what Congress was focused on. As set forth in defendant's *Daubert* Reply, Congress regulated certain weapons in the NFA out of concern for the victims of gang violence, not for the gangsters using the weapons—so the "highly dangerous" language is not a reference to any danger the weapons might cause to their users. *See* Dkt. No. 64 at 16 (citing cases). And second, the inability of Exhibit 1 to be safely used as a shotgun is directly relevant to the NFA definition, which states that a shotgun must be "intended to," "designed to," and "made to" fire a fixed shotgun shell to expel either ball shot or a single projectile. This is not a situation in which Exhibit 1 presents *some* danger to the user—as all firearms likely do, and as modified firearms likely do to a greater degree—but a situation in which the danger makes it entirely unsuitable and unusable for firing ball shot. Accordingly, Mr. Vasquez's proposed testimony gives meaning to the words used in the statutory definition because it is based on what Exhibit 1 is intended and designed or made to

do, and because it goes to operability (which is necessary for the reasons argued in defendant's *Daubert* Reply, *see* Dkt. No. 64 at 13-15).

   *Fourth*, and finally, the government contends that the concluding portion of the NFA shotgun definition (stating that NFA shotguns include "any such weapon which may be readily restored to fire a fixed shotgun shell") is "at issue in this case" and that Mr. Vasquez's testimony ignores it. Dkt. No. 61 at 6. The government does not explain how ready restorability is at issue, but it is not. That is because the word "restore" means to return something to a condition in which it previously existed.[1] And in this respect, it is important to distinguish the NFA definition of shotgun (26 U.S.C. § 5845(d)) from the NFA definition of "machinegun," which includes not only firearms that may be readily restored to function as machineguns, but also items that may be converted into a machinegun using "any part . . . or combination of parts" in the person's possession or control. *See* 26 U.S.C. § 5845(b). The "shotgun" definition has no such language and asks only whether the item itself may be "readily restored to fire."

---

[1] *See* Merriam-Webster.com Dictionary, merriam-webster.com/dictionary/restore (last accessed Apr. 27, 2026) (defining "restore" as "to bring back to or put back into a former or original state"); Oxford English Dictionary, www.oed.com/dictionary/restore_v1 (last accessed Apr. 27, 2026) (defining "restore" as "To bring back (a person or thing) to . . . a previous, original, or normal condition."); Cambridge Dictionary, dictionary.cambridge.org/us/dictionary/english/restore (last accessed Apr. 27, 2026) (defining "restore" to return something or someone to an earlier good condition or position"); Dictionary.com, www.dictionary.com/browse/restore (last accessed Apr. 27, 2026) (defining "restore" as "to bring back to a former, original, or normal condition, as a building, statue, or painting").

On this question, the facts are unambiguous: the only way that Exhibit 1 could be "restored" to a previous firing condition in which it previously existed would be to combine it with an additional barrel piece that is not part of Exhibit 1. But the NFA definition of "shotgun" does not ask whether Exhibit 1 can be converted to operability by combining it with other parts—only whether the item itself can be readily restored to operability. Accordingly, the government is incorrect in stating that the "readily restored" portion of the NFA definition of shotgun is at issue in this case, or that Mr. Vasquez's testimony should be excluded for ignoring it.

Relatedly, however, it is important to note that the "readily restored" portion of the NFA definition of shotgun *is* relevant to this case in one critical respect: it demonstrates that the entirety of the definition preceding it requires operability. *See* Dkt. No. 64 at 14. Otherwise, it would serve no purpose for Congress to have clarified that the definition also includes those weapons which may be readily restored to fire. For this reason, it would violate the canon against surplusage to interpret the remainder of the definition as not requiring operability—as the government explicitly asks this Court to do in arguing for the admission of Officer Bautista's testimony (*see* Dkt. No. 58 at 4).

## III. Anthony May

As set forth in the defense's Motion for Advanced Ruling on Jury Instructions Relating to Count Two (Dkt. No. 68), the government is required to prove that Mr. Zghailat Qaralleh knew of the characteristics of the explosive materials that would subject them to federal license or permit requirements. If he did not know of those

characteristics and instead thought he moved or received consumer fireworks, then he would not be guilty of Count Two. Mr. May's proposed expert testimony will center on this issue: generally educating the jury about the different types of explosive devices, the federal regulations that apply – or not – to those explosive devices, the legal market for consumer fireworks and how that market sells consumer fireworks or materials to consumers to make items that resemble illegal explosives but are not, and that given this market, the reliance on solely the physical characteristics of an item would not necessarily indicate that they contain the explosive materials that subject them to federal license or permit requirements. And specifically to this case, Mr. May will testify that the four items are properly classified as illegal explosive devices (not improvised explosive devices, as the government submits) based on their net explosive materials weight, but that reliance on their physical characteristics alone does not indicate that they would be over 50mg of explosive materials and therefore subject to federal regulation.[2]

The government argues that Mr. May's proposed testimony is inadmissible and irrelevant for four reasons.

*First*, the government objects to Mr. May's proposed testimony about improvised explosive devices being used during criminal activity as irrelevant and speculative. Mr. May will testify as to the different types of explosive devices –

---

[2] Although the defense disagrees that Mr. May lacks the appropriate foundation to testify as to the credibility of the ATF's evidence collection, processing, and chain of custody for items 1-4, Gov. Mtn. at pg. 8, the defense does not anticipate soliciting this testimony from Mr. May at trial.

ranging from consumer fireworks to improvised explosive devices. Consistent with ATF's own guidance on improvised explosive devices, an important characteristic is whether such devices were used in connection with criminal activity: "Improvised explosive devices constructed from various objects are prohibited and extremely dangerous. These include **pipe bombs**, which are usually made from steel pipes that contain an explosive mixture with a fuse sticking out. These devices are used during criminal acts and can cause bodily harm and damage to property."[3] Therefore, Mr. May's proposed testimony is almost verbatim to the ATF's guidance and is an important aspect in differentiating between explosive devices.

Additionally, Mr. May's proposed testimony is that the four items are properly classified as illegal explosive devices and not improvised explosive devices, as the government's experts submit. To reach that conclusion, Mr. May reviewed the discovery in this case as to the four items, where there was nothing to indicate that Mr. Zghailat Qaralleh constructed these items himself or that they were used during any criminal acts – this is not speculation but based on the record. These facts support Mr. May's conclusion that the government incorrectly classified these items as improvised explosive devices as opposed to illegal explosive devices.

*Second*, the government objects to Mr. May's proposed testimony that the physical characteristics alone of the four items would not indicate to a typical layperson that they contain explosive materials over 50mg (and therefore are not

---

[3] *See* https://www.atf.gov/explosives/tools-services-explosives-industry/explosive-products-and-devices/illegal-explosives (last visited Apr. 27, 2026) (emphasis in original).

consumer fireworks) and are subject to federal permit and license requirements as irrelevant, not within the realm of expert testimony, and unduly confusing. Mr. May's proposed testimony goes to the heart of the knowledge requirement for Count Two that separates criminal conduct from innocent conduct. Specifically, Mr. May will testify as to *why* the physical characteristics alone of the four items in this case do not indicate in and of themselves that they contain explosive materials to the degree that require compliance with federal regulations.

Mr. May's proposed testimony is not a conduit for Mr. Zghailat Qaralleh's intent or version of events, but is instead meant to educate the jury in three main respects. First, to educate the jury about the legal market for consumer fireworks and how that market – from fireworks retailers to online sellers – sells consumer fireworks or the materials for consumers to make items that resemble illegal explosive devices (which contain explosive materials to the degree which require a federal license or permit) but are *not* such devices. Second, based on that easily accessible market, reliance on the physical characteristics alone of an item with explosive materials would not necessarily indicate that the item contains explosive materials to the degree that requires a federal license or permit. And third, reliance on the physical characteristics alone in this case for the four items does not indicate that they contain explosive materials to the degree that requires a federal license or permit. Instead, the only way to make that determination is to weigh the explosive materials. All of this proposed testimony fits squarely within the scope of expert testimony and is critical to the jury to understand this issue. This is especially true

given that the government's experts – SA Letteney and SA Anderson – anticipate testifying as to the same information, they just reach a different conclusion. *See, e.g.,* Gov. Rule 16(a)(1)(G) Notice (Dkt. No 32) at pgs. 2-5.

And *third*, the government objects to Mr. May's proposed testimony about the storage requirement for consumer fireworks as irrelevant. However, the government takes that line of testimony out of context. Mr. May's proposed testimony is to the federal regulatory landscape to all explosive materials – not just consumer fireworks. And with respect to consumer fireworks specifically, Mr. May's testimony would be reflective of that federal regulatory landscape that the parties agreed on in the joint proposed jury instructions. *See* Joint Proposed Jury Instructions (Dkt. No. 65) at pg. 34 (Instruction No. 31, Consumer Fireworks – Definition). Additionally, both parties' joint proposed jury instructions make clear that for purposes of Count Three (misdemeanor improper storage of explosive materials), the same *mens rea* standard required in Count Two does not apply to this charge, which addresses the government's concern regarding confusion to the jury.

*　　*　　*　　*　　*

Date: April 27, 2026          Respectfully submitted,


**AMER TASIR ZGHAILAT QARALLEH**

By Counsel:
Geremy C. Kamens
Federal Public Defender


By:                /s/
             Brittany M. Davidson, VA Bar No. 90660
             Todd M. Richman, VA Bar No. 41834
             Assistant Federal Public Defenders
             1650 King Street, Suite 500
             Alexandria, Virginia 22314
             Telephone: (703) 600-0800
             Facsimile: (703) 600-0880
             brittany_davison@fd.org
             todd_richman@fd.org

-11-